## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD A. MARSHALL et al.,** | : | |
| *Plaintiffs* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **ZIMMER, INC. et al.,** | : | **No. 18-3363** |
| *Defendants* | : | |

### MEMORANDUM

PRATTER, J.                                                                 SEPTEMBER 𝓎 , 2020

In this defective medical device case, the Marshalls allege that the Zimmer Defendants (collectively, "Zimmer") are responsible for complications Mr. Marshall suffered after a knee replacement surgery. During that surgery, a *NextGen* RHK knee replacement system manufactured and sold by Zimmer was implanted in Mr. Marshall's left leg. The Marshalls assert the system was defective, and thus caused Mr. Marshall's catastrophic injuries. Arguing that the Marshalls cannot create a triable issue of fact with respect to a product defect, Zimmer seeks summary judgment on all of the plaintiffs' claims.

The Marshalls concede that their claims rise and fall on whether they can present expert testimony with respect to their allegations of a product defect. The Court has given the Marshalls multiple opportunities to find an expert to support their claims, but the Marshalls seem to have come up short. Thus, the Court must decide whether the Marshalls can proceed on the present record. For the reasons that follow, the Court will grant the defendants' motion for summary judgment.

1

## BACKGROUND[1]

### I.    Factual Background

#### a.  *General information about the NextGen RHK knee replacement system*

The *NextGen* RHK knee replacement system has been made for clinical use since 2002. The replacement system is a hinge knee system that is intended as a "last resort" or "salvage" implant system for patients with particularly challenging orthopedic presentations. The system assists patients who require additional stabilization, in part due to previously failed surgeries related to resolving knee complications.  Declaration of Anthony M. DiGioia III, M.D. ("DiGioia Decl."), at ¶34-8.

The knee replacement system is comprised of several components, including a femoral component, a hinge pin, a hinge post, a hinge post extension, an articular surface, and a tibial baseplate. All of the metal components of the system are manufactured from *Zimaloy* ® Cobalt-Chromium-Molybdenum Alloy. The polyethylene components are made of ultra-high-molecular-weight polyethylene. The following image is a pictorial representation of the at-issue knee system:

---

[1]      The following facts are undisputed by the parties unless otherwise noted. The Court observes that the Marshalls fail to rebut Zimmer's statement of material facts in accordance with this Court's pretrial rules and procedures in several ways. To the extent the Marshalls have not rebutted the Zimmer's factual averments with record support, the Court considers Zimmer's assertions of material facts undisputed. Any other unsupported factual assertions, advanced by either party, are treated as merely conclusory.



Front View

Lateral View

### b. *Mr. Marshall's history of left knee complications*

Mr. Marshall has a long history of medical complications related to his left knee. He had at least six procedures leading up to the surgery at issue in this litigation. At age 21, Mr. Marshall had a left knee arthrotomy. Five years later, after developing a staph infection in the same knee, he had an arthroscopy. In 2005, he underwent total knee replacement, followed by an incision and drainage to treat post-surgical hematoma. Mr. Marshall suffered from a patella fracture and had an extensor mechanism allograft the following year. Two years later, Mr. Marshall had his prior knee prosthesis removed.[2] He also underwent an insertion of an antibiotic spacer block to treat an infection that had formed in his knee. In December of 2008, he had a new antibiotic spacer block inserted into his left knee.

---

2    The Marshalls assert that Mr. Marshall's surgeon did not complete the total knee revision, but they do not cite to the record for this averment.

    *c.  Mr. Marshall's experience with the NextGen RHK knee replacement system and*
       *post-surgery complications*

Mr. Marshall had surgery on his left knee in 2009 at Pennsylvania Hospital[3] in Philadelphia to address severe arthritic disease and his previously failed knee procedures.  The surgery involved a revision of his left knee as well as the re-implantation of knee components (i.e. of the Zimmer *NextGen* RHK knee replacement system).  During that procedure, Mr. Marshall also had extensor allograft reconstruction.

Initially, after his 2009 surgery, Mr. Marshall had no complaints.  However, according to Zimmer, Mr. Marshall began to complain of knee pain around December 2010.  Mr. Marshall asserts he experienced pain sooner than that date.  During that same year, he was advised to see an amputation specialist.

Mr. Marshall's discomfort and knee complications progressed, and in 2015, Dr. Gwo-Chin Lee performed yet another surgery on Mr. Marshall's left knee.  This surgery was a total knee anthroplasty and reconstruction of the extensor mechanism disruption.  A problematic component was removed.  Dr. Lee reconstructed the extensor mechanism with a new allograft.  During the surgery, Dr. Lee also found "complete disruption of the quad tendon," significant bone loss, and a large amount of metallosis within the joint.[4]  DiGioia Decl. at ¶ 30.

Mr. Marshall alleges that as result of the implant of the defective Zimmer knee replacement system, his left knee developed metallosis, and he suffered catastrophic injuries, which required a revision procedure.  At some point prior to January 2014, Mr. Marshall was also diagnosed with

---

[3]    Zimmer asserts prior to the removal of this action from state court, Pennsylvania Hospital was dismissed from the case because the plaintiffs failed to secure a certificate of merit from an expert necessary to proceed on their claims against the hospital.  The Marshalls do not contest this.

[4]    The Marshalls assert metallosis is a contamination of the joint with metallic debris.

Non-Hodgkin's lymphoma. According to Zimmer, while Mr. Marshall's medical records do not contain complete information regarding Mr. Marshall's diagnosis and treatment of the disease, Mr. Marshall contends that the loosening and metallosis in his left knee after the Zimmer device was implanted contributed to the development of his lymphoma.

Mr. Marshall's left leg has been amputated. The Marshalls assert his amputation was a direct result of the surgery and the defective Zimmer medical device.

### d. Expert evidence in support of the defendants' motion for summary judgment

Mr. Marshall has not proffered a medical expert in support of his claims.[5] The Zimmer Defendants rely on their defect and causation expert, Dr. Anthony M. DiGioia, an orthopedic surgeon with approximately 32 years of experience and who reportedly has performed several thousand total knee replacements.

Dr. DiGioia opines that the loosening and metallosis, and the eventual need for revision surgery in Mr. Marshall's knee were caused by patient factors specific to Mr. Marshall, not any defect in the *NextGen* RHK system. According to this defense expert, loosening and metallosis can happen with any system, particularly in very challenging complex revision cases like Mr. Marshall's, which can result in wear. Dr. DiGioia contends that Mr. Marshall's medical records show that the device was loose at least six years before it was revised in 2015. Dr. DiGioia believes that Mr. Marshall developed loosening due to his prior loss of bone stock, loss of his extensor mechanism, and then, secondarily, due to his smoking and failure to follow medical advice following the 2009 surgery. That is, regardless of the system implanted, according to the defense expert, Mr. Marshall would have developed loosening of his left knee, which led to his metallosis, and "one cannot conclude that the *NextGen* RHK components implanted in Mr. Marshall were

---

[5]     The Court details in another section of this Memorandum attempts the Marshalls have made to obtain an expert to support their claims.

defective merely because he developed loosening, wear, metallosis, and eventually needed a revision procedure." DiGioia Decl. at ¶40.

Dr. DiGioia also asserts that while the system is reserved for the most challenging orthopedic patients, it has enjoyed a high clinical success rate. In his practice, he has used the medical device challenged by the plaintiffs but has never seen any metal wear in his patients with the medical device suggestive of a defect; nor has he observed any defect otherwise. In the literature he reviewed, Dr. DiGioia also found no proof that the *NextGen* RHK components are at risk for developing metallosis due to design defect. Based on his review of Zimmer's discovery responses, he has not seen information suggesting a link between the device and any later developed metallosis in a patient other than Mr. Marshall.

## II.    Procedural Background

A detailed summary of the procedural history of this case is helpful to the Court's determinations today.

The case has been pending since 2017 where the plaintiffs initiated the action in the Court of Common Pleas of Philadelphia County. The case was removed in 2018. By scheduling order, to the extent that they would rely on them, the Marshalls were required to serve expert reports by July 15, 2019. Scheduling Order of January 14, 2019 (Doc. No. 16). In response to the absence of such service, Zimmer filed its first motion for summary judgment, contending that the Marshalls could not substantiate their state law claims sounding in negligence, strict liability, and breach of warranty with respect to the knee replacement system at issue. In response, the Marshalls sought additional time to find an expert who would opine in support of their allegations of defect and causation.

6

In December 2019, the Court heard oral argument on the motion, during which counsel for the plaintiffs represented that all of the Marshalls' claims could not be sustained without expert evidence on defect or causation, and that counsel would require another 60 days to find an expert to support the plaintiffs' claims. The Court then granted the Marshalls 60 days from the entry of the Court's order to find an expert to support their claims of product defect. Should the plaintiffs fail to provide such a report, the defendants were granted leave to refile their motion for summary judgment.

In February of this year, Zimmer filed a renewed motion for summary judgment, seeking summary judgment mainly on the basis that the Marshalls had not galvanized expert evidence to support their claims. In response, the plaintiffs sought even more time to find an expert. Moreover, they relied entirely on their previous responses filed with respect to Zimmer's initial motion for summary judgment, and admitted "they have not yet identified an expert or experts to opine that defendants' knee replacement system is defective and that the defect caused the harm suffered by plaintiffs. . . . [N]ow in light of current exigent circumstances, plaintiffs request that this Court grant them additional extension of time in which to provide expert reports and complete expert discovery." Pls.' Memorandum of Law (Doc. No. 39). Despite the lack of further elaboration on how the exigent circumstances specifically posed a hurdle to their ability to find an expert, the Court permitted the plaintiffs another extension of time, permitting them 30 additional days to find an expert to support their claims.[6]

In May of this year, the plaintiffs reported they still could not find an expert. According to the Marshalls, "[t]o date[, they] have been unable to produce expert testimony to the effect that

---

[6]     "Plaintiffs shall, within thirty (30) days of entry of this Order, find and file such an expert report. On that same date, Plaintiffs shall file a status report with the Court related to the expert evidence, including an affidavit sufficient to meet the standards under Federal Rule of Civil Procedure 56(d)." Order of April 17, 2020 (Doc. No. 41).

any alleged defect in the subject knee replacement system caused, or contributed to, metallosis to plaintiff Richard Marshall's left knee. As set forth in the accompanying declaration of counsel, the above-described expert evidence is essential for plaintiffs to oppose defendants' pending motions." Status Report of May 20, 2020 (Doc. No. 42).

Plaintiffs have also submitted a Rule 56(d) affidavit stating that prior to the defendants' initial motion for summary judgment, counsel for the Marshalls consulted various professionals about the case. After the filing of the dispositive motion, counsel for the plaintiffs consulted additional experts in an ongoing effort to obtain and produce expert evidence related to the defendants' motion. Counsel claims that by way of these consultations, it apparently became clear to counsel at least that Mr. Marshall did have metallosis in his knee, and the source of the metallosis was the Zimmer knee device, which in turn caused Mr. Marshall's symptoms. Counsel for the plaintiffs declares he "learned that there is at least a potential link between metallosis and a type of cancer called lymphoma, with which plaintiff was diagnosed 2-3 years after his 2009 surgery and 2-3 years before his August 2015 surgery." Declaration of Theodore J. Caldwell, Jr., Esquire (Doc. No. 43), p. 3. Counsel also asserts that the Marshalls and he "learned that multiple claims have been brought alleging defects in hip replacement systems causing metallosis in the affected hip joints, that many of those cases have been settled by the manufacturers, and that those claims included claims brought against one or more of the Zimmer Defendants." *Id.* Yet, despite this information, the plaintiffs have not yet been able to obtain any expert evidence that Mr. Marshall's metallosis was caused by a defect in the Zimmer knee replacement system. Nor can they find an expert to opine that Mr. Marshall's cancer was caused by the metallosis. *Id.*, p. 4. Counsel for the Marshalls also claims "over the last two months, counsel's efforts to obtain and produce expert

8

evidence necessary to oppose defendants' motion . . . have been hampered by the ongoing coronavirus . . . crisis and judicial emergency in Pennsylvania." *Id.*

### LEGAL STANDARD

A court can grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact finder could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson,* 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson,* 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored

9

information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

**DISCUSSION**

## I.      Preliminary matters

The Court first addresses whether it would be proper to address the motion for summary judgment on the merits on the present record.

The Marshalls' record support is quite limited. After instructing the plaintiffs that they must respond to Zimmer's assertion of material facts in accordance with the Court's pretrial policies and procedures,[7] *see* Order of October 25, 2019 (Doc. No. 27), in which the Court

---

[7]     The relevant portion of the Court's pretrial rules and policies states:

> All summary judgment motions and oppositions to such motions must contain a numbered paragraph-by-paragraph recitation of facts with specific citations to the record for the support of all of those facts. The Court will not consider any assertion of a fact that is not supported by a citation to the record. A party opposing summary judgment must state in similar paragraph form whether that party agrees or disagrees that the fact(s) as stated by the moving party are undisputed. If a party contends that a fact is in dispute, citation must be made to the record evidence that supports the party's view of that particular fact. Failure to address the moving party's factual contentions in this manner will lead to the Court's consideration of the moving party's factual assertion(s) as undisputed. When the parties include deposition transcripts as record evidence, the record must include the full deposition transcript. When replying to the movant's statement of undisputed facts, a numbered list of "admitted" or "denied" is insufficient. Parties shall cut and paste the initial statement of facts, repeating the numerical layout of the opening brief, and put the response in italics. Any additional facts to be added should be placed underneath with an (a) or (b) designation as necessary, so as to preserve the initial numbering.

10

cautioned "failure to address Defendants' factual contentions in the manner set forth in the pretrial policies will lead to the Court's consideration of the Defendants' factual assertions as undisputed", the Marshalls filed a response that remained deficient under the Court's pretrial rules and Federal Rule of Civil Procedure 56. Upon close review of the Marshalls' counter-statement of material facts, citations are made to Dr. Robert Booth's deposition testimony, as well as Mr. Marshall's deposition testimony, which are produced only partially. The response to the statement of material facts describes the production of documents, which apparently support Mr. Marshalls' claims with respect to the extent of his medical history, but these have not been provided to the Court for review. *See, e.g.*, Pls.' Response to Defs.' Statement of Uncontested Material Facts (Doc. No. 28), ¶2 ("[I]n March 2018, counsel for Pennsylvania Hospital, co-defendants with the Zimmer Defendants in the state court action, issued subpoenas for a number of plaintiff Richard Marshall's medical records, including for records and imaging studies from Penn Presbyterian Medical Center, where Mr. Marshall has undergone multiple surgeries in his left lower extremity since August 2015. When produced by the hospital, these records were available to all parties."); *id.*, ¶8 ("[O]n November 5, 2018, plaintiffs produced voluminous medical records setting forth Mr. Marshall's medical and surgical history relating to his left knee.") Furthermore, the Marshalls cite to the defense expert's report in support of many of their factual assertions.

Presented with this record, the Court must determine whether the Marshalls deserve yet another opportunity to try to find a proponent expert. *See* Fed. R. Civ. P. 56(d) ("If a nonmovant showed by affidavit or declaration, that for specified reasons, it cannot present facts essential to justify its opposition, the court may: (2) allow time to obtain affidavits or declarations or to take

---

Judge Gene E.K. Pratter's General Pretrial and Trial Procedures, pp. 19-20, *available at* https://www.paed.uscourts.gov/documents/procedures/prapol2.pdf.

discovery; or (3) issue any other appropriate order."); *see also* Fed. R. Civ. P. 56(e). Thus far, the Marshalls have had an initial deadline of July, 2019, followed by two additional extensions of time to secure expert support for their claims. The Court declines to grant another opportunity. Nothing in the plaintiffs' Rule 56(d) affidavit demonstrates why the Court should permit yet another extension of time. The plaintiffs have admittedly not prosecuted this case with due diligence.[8] They have not met their scheduling order deadline, or any of the Court's prior extended deadlines, for the disclosure of expert material. Nor did they seek an extension of time prior to the filing of Zimmer's initial motion for summary judgment. Tr. of Oral Argument (Doc. No. 34), p. 4.

Under similar circumstances, judges in this district, as well as the Third Circuit Court of Appeals have rejected efforts to delay resolution of a case after repeated extensions of time have been granted or the litigant has acted in a dilatory manner in seeking to secure and designate an expert witness. *See McCracken v. Ford Motor Co.*, 392 F. App'x 1, 4 (3d Cir. 2010) (affirming district court's summary judgment grant in favor of car manufacturer, where plaintiff had alleged he contracted thyroid cancer due to defective windshield, the plaintiff had failed to provide expert testimony, and the district court declined to extend time yet again for the plaintiff to find or appoint an expert); *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, 85 F. App'x 845, 848 (3rd Cir. 2004) (affirming district court's grant of summary judgment where under state law, expert testimony regarding causation was required, and the plaintiff sought to designate such an expert months after the deadline for doing so) (citing *Koplove v. Ford Motor Co.*, 795 F.2d 15, 17 (3d Cir. 1986)); *Koplove*, 795 F.2d at 18 (rejecting argument that district court abused its discretion in failing to provide more time for plaintiffs to produce an

---

[8]     The Marshalls candidly admit that discovery has not "proceeded expeditiously and that a large measure of the reason for that lies with them." Pls.' Memorandum in Opposition to Motion for Summary Judgment (Doc. No. 24-2), p. 13. Despite this lack of diligence, the Court has already provided two additional extensions of time for the plaintiffs to find an expert to support their claims.

expert on causation in light of their Rule 56 affidavit when the deadline for filing an expert report had passed and at the time of summary judgment, the plaintiffs had still failed to identify a causation expert).

As our appellate court has aptly pointed out: "we believe that a party taking the position that nine months is an inadequate period in which to obtain and file an expert's report has an obligation to provide the court with a record which affirmatively demonstrates, with specificity, diligent efforts on his or her part and unusual circumstances which have frustrated those efforts." *Koplove*, 795 F.2d at 18. "To require less is to deprive trial judges of the ability to effectively manage the cases on their overcrowded dockets. As Rule 16 recognizes, scheduling orders are at the heart of case management. If they can be disregarded without a specific showing of good cause, their utility will be severely impaired." *Id.*

From the date of the initial deadline for producing their proponent expert, namely some 14 months ago, the plaintiffs have failed to identify an expert, even the prospect of one, who would support their claims in this case. At this time, over a year after the deadline set forth in the Court's initial Scheduling Order, and after repeated extensions of time, the Court finds that another opportunity to seek expert testimony on defect or causation would unreasonably further delay the case.

The Court will now address the merits of the motion for summary judgment on the present record.

**II.    The Marshalls' claims**

With respect to the substantive claims asserted, the Marshalls set forth products liability claims alleging defects in design, manufacturing, and failure to warn. They also assert breach of

13

express and implied warranties. Finally, they bring a loss of consortium claim on behalf of Mrs. Marshall.

### a. The breach of express warranty claim

"'Under Pennsylvania law, an express warranty arises out of the representations or promises of the seller.'" *Kline v. Zimmer Holdings, Inc.*, No. 13-513, 2013 WL 3279797, at \*7 (E.D. Pa. June 27, 2013) (citation omitted). To sustain an express warranty claim, a plaintiff must prove that an express warranty was created, including the source of the alleged warranty. *Id.* at \*8 (citations omitted). However, the Marshalls do not cite a single representation or promise of the seller in the record, nor any source of that promise or representation. At oral argument on Zimmer's initial motion for summary judgment, counsel for the plaintiffs conceded this point. Tr. of Oral Argument, p. 6 ("I don't know that there's an express warranty claim. It's truly more of an implied warranty of merchantability and fitness.") For this reason, the Court finds the Marshalls have abandoned the breach of express warranty claim. The Court grants summary judgment on this cause of action.

### b. The remaining claims

The theory behind the remainder of the Marshalls' claims is that there is a defect in the Zimmer knee replacement system. *See, e.g.*, Tr. of Oral Argument, p. 6 (counsel for the plaintiffs explaining that their breach of implied warranty claims rest on a product defect); p. 13-14 (counsel explaining that the case rises and falls entirely on a bona fide expert on the claim of defect). Without sufficient proof of such a defect, the plaintiffs cannot create triable fact issues with respect to the lynchpin of their causes of action.[9]

---

[9]     With respect to the products liability claims on the basis of the defective design, manufacturing defect, and failure-to-warn theories, the plaintiffs assert both strict liability and negligence claims. Under Section 402A, a plaintiff may recover based on a strict liability theory if his or her injury was caused by a product in a "defective condition unreasonably dangerous to the user or consumer." Restatement (Second)

14

Generally speaking, the Third Circuit Court of Appeals, interpreting Pennsylvania state law which governs the substantive claims here, requires expert testimony to support a plaintiff's claims in a products liability suit if the litigation involves "highly technical . . . subject matter[.]" *McCracken*, 392 F. App'x at 2 (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 159 (3d Cir. 2000)). Our appellate court has refined the distinction between when an expert is required, and when one may not be, in products liability cases.

In *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412 (3d Cir. 1999), the court of appeals held that a jury must decide if the record evidence, apart from the proffered expert evidence, would be sufficient to substantiate the plaintiff's claims. Mr. Padillas was injured while washing down the blade of a chicken drum and thigh cutter designed and manufactured by the defendant. The injury occurred when the hose the plaintiff was using to clean the machine became entangled and drew his arm into the cutter, which was unguarded. Mr. Padillas asserted strict products liability, negligence, breach of warranty and failure to warn claims. *Id.* at 414. Reversing the district court's grant of summary judgment in favor of the defendant, after the district court had excluded the expert opinion on defect on *Daubert* grounds, the appellate court determined that the critical issue was whether the plaintiff had offered enough evidence apart from the expert testimony sufficient to raise a triable issue of fact on defect, namely, evidence from which a jury could find that the machine lacked some element necessary to make the cutter safe. Noting the other non-expert proof

---

of Torts §402(A). "'To prevail in a negligence [products liability] action [on the basis of a design defect, manufacturing defect, or failure-to-warn], a plaintiff 'must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage.'" *Keen v. C.R. Bard, Inc.*, No. 13-5361, 2020 WL 4873634, at *8 (E.D. Pa. Aug. 19, 2020) (citing *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 61 (3d Cir. 2009)). As presented, "defect . . . is a[lso a] predicate for" the Marshalls' claims of breach of implied warranty. *See Schlier v. Milwaukee Elec. Tool Corp.*, 835 F. Supp. 839, 843 (E.D. Pa. 1993) (interpreting Pennsylvania law); *see also Keen*, 2020 WL 4873634, at *14 ("Many courts have recognized that the theories of strict liability and breach of implied warranty of merchantability 'are parallel theories of recovery, one in contract and the other in tort.'") (citation omitted).

presented in support of plaintiff's claims of defect, including reports pre-dating the accident authored by the defendant's engineering manager noting safety concerns about the machine not being well guarded, a memorandum from a third-party employee to the defendant-company referencing the machine's safety problems related to the blades being unguarded, and evidence of a similar machine from which the cutter at issue was derived which had a more robust guard system, the appellate court held that on this evidence alone, a jury could find there to be a defect in the chicken cutter. *Id.* at 415-16. In *Padillaz*, all the primary facts could be understood by a lay jury and inferences could be drawn from them, in the same way an expert could make deductions. *Id.*

The following year, in *Oddi v. Ford Motor Co.*, 234 F.3d 136, 159 (3d Cir. 2000), the court of appeals affirmed summary judgment in favor of the manufacturers of the components of a truck on the basis that the plaintiff could not sustain a claim of product defect without expert evidence. Ford had manufactured the basic component parts of the truck, such as the frame rails, axles, engine, drive train, wheels, and front bumper. Grumman had designed and manufactured the finished vehicle, including the occupant compartment (or "cab.") *Id.* at 141. The plaintiff was catastrophically injured while he was driving the truck, and the truck struck a guardrail and a bridge abutment. The plaintiff had pursued strict liability, negligence, breach of warranty, and failure to warn claims, asserting Ford's defective designs, including of the bumper, and Grumman's defective design and manufacturing of the cab. Noting that while expert testimony is not necessary if the primary facts can be accurately and intelligibly described to a jury, and the jury can as competently understand and draw conclusions from the facts as an expert can, the appellate court held that to prove an element of a cause of action that the truck's components were defective would require expert testimony on defect. *Id.* at 159.

The appellate court drew a distinction between *Padillas* and the case at bar. It noted, in *Padillas*, a whirling cutting blade without a guard was obviously defective, and images and non-expert testimony about the dangerousness of the cutter would be presented to a lay jury such that expert testimony on defect in that case was unnecessary. *Id.* However, in the case before it, the appellate court stated "[w]e do not believe that a juror could look at the front bumper and the flooring of the cab of the truck [the plaintiff] was driving and reasonably conclude [that] its design was defective . . . ." *Id.* Rather, according to the appellate court, "[s]uch [a] conclusion[ was] within the peculiar competence of experts." *Id.*

The Court finds that the present circumstances are considerably more like those presented in *Oddi* than in *Padillas.* That is, "expert testimony is needed where the subject is beyond the purview of the ordinary lay jury's experience and knowledge." *Schlier*, 835 F. Supp. at 842. Yet, the Marshalls have failed to proffer expert evidence to support their claim of product defect. Thus, they also cannot proffer evidence on causation.

On the other hand, Zimmer has presented an expert who opines that rather than a product defect causing Mr. Marshall's loosening, metallosis, and ultimate revision, and Mr. Marshalls' other alleged injuries, it was his own particular personal factors that resulted in the complications he avers he suffered. The opinion relates to technical subject matter, and the Court does not find a lay juror could look at the medical device and reasonably determine the design, or some other aspect of the device, was defective. Thus, expert evidence is required; yet the Marshalls have not only failed to produce it, but they have also failed to rebut the factual assertions of the defense expert. Accordingly, they have failed to support their product defect claims, thereby failing to create a genuine dispute of material fact with respect to any of their substantive claims.

17

Moreover, nothing else in the record, even when viewed in the light most favorable to the Marshalls, supports their assertions of product defect. And, counsel for the Marshalls' conclusory averments, including those related to hip replacement systems, do not assist the Marshalls with respect to their allegations regarding a knee replacement system at issue in this case. Consequently, even under *Padillas*, the Court finds summary judgment appropriate. *See also McCracken*, 392 F. App'x at 2 (rejecting plaintiff's argument of sufficient evidence to survive summary judgment where he submitted general Environmental Protection Administration data, a list of books and articles, a deposition transcript, and affidavits from the plaintiff's mother and himself reporting an increase in radiation when driving their vehicle).[10]

Because the Marshalls have not offered sufficient proof to sustain their claims related to a defective medical device, their product liability and breach of warranty claims must fail as a matter of law. Because the Court has dismissed the plaintiffs' substantive claims, the Court also grants summary judgment on Ms. Marshall's derivative claim. *See Robinson v. Delta Intern. Mach. Corp.*, 274 F. R.D. 518, 525 (E.D. Pa. 2011) ("Any action for loss of consortium is derivative[;] the viability of such a claim depends upon the substantive merit of the injured party's claims.").

---

[10]     As noted, the Marshalls argue they have produced substantial evidence relevant to their claims, and direct the Court's attention to the defense expert's declaration in support. The Marshalls claim they produced thousands of medical records detailing the surgical and medical history relating to Mr. Marshall's left knee. They assert the evidence is summarized in the factual background of their memorandum, and is the basis of the factual assertions made in Dr. DiGioia's declaration. They also generally assert they have provided deposition testimony of Dr. Booth and Mr. Marshall which together, they claim, describes the "various medical events, their results, and their consequences[.]" Memorandum in Opposition to Motion for Summary Judgment, p. 13. There are several problems with the Marshalls' arguments. Again, the Marshalls attempt to rely on records that they have not provided for the Court's review. Their arguments that such documents exist and purport to support their allegations, alone, amount to mere conclusory averments that their claims are meritorious. Such statements cannot and do not meet their burden at the summary judgment stage. Nor do the partial deposition citations meet their present burden. Finally, several of the factual averments made are consistent with the defense expert's findings, and do not rebut them. That is, even if the Court were to consider all of the Marshalls' factual assertions to be true, for instance that metallosis and other medical conditions developed after the Zimmer device was implanted, such averments do not rebut the defense expert's conclusions that this coincidence is not equivalent to causation.

18

## CONCLUSION

While the Court appreciates the facts of Mr. Marshall's complicated and difficult medical history, and certainly sympathizes that he has suffered catastrophic injuries over the course of his lifetime, the Court's present determination must be whether the Marshalls have proffered sufficient factual evidence to withstand summary judgment on their asserted claims. They have not supported their case with expert evidence, which is critical to the survival of their causes of action. For this reason, and because the record otherwise fails to create a genuine dispute of material fact with respect to any of their claims, the Court grants the defendants' motion for summary judgment. An appropriate order follows.

BY THE COURT:

GENÉ E.K. PRATTER
UNITED STATES DISTRICT JUDGE

19